The next matter on our calendar, I'll give these guys a moment to clear the tables, is Jordan Weckoff and others v. Office of the Commissioner of Baseball and others. Mr. Weckoff. Good morning, Your Honors, and may it please the Court. My name is Garrett Brushouse, and I represent the plaintiff appellants in this antitrust case brought by two Major League Baseball scouts. And I would like to reserve one minute for rebuttal. Okay. The district court dismissed this action based on a broad reading of baseball's judicially created exemption from antitrust laws. That decision should be reversed for two main reasons. First, the district court's broad reading under this type of fact pattern, which is outside the usual contours of baseball's antitrust exemption, represents an outlier. So instead of affirming an outlier and extending the exemption into a new area where it's never been extended before and creating an exemption that is essentially without limits, the court should instead adopt the reasonable intermediate construction that has been used by other courts when analyzing facts . . . Which courts? What are you talking about in terms of this is a narrow exception? It seems to me the Supreme Court's description of the exemption is very broad indeed. And there are the outlier . . . there's maybe one outlier case that you might be able to rely on. So tell me what it is that is binding on us that suggests, or even is persuasive to us, that suggests a narrow construction of the exemption. Sure, Your Honor. So the Supreme Court cases that dealt with the exemption did so in two areas. An area of league structure in the federal baseball case, and then areas of player contracts in the Toulson case and in the Flood case. Those decisions may have at times used broad language, but they also, if you look at the facts and look at the rationale, you see that there are limitations. Don't they all rely on something called the business of baseball? And aren't your clients also in the business of baseball? Your Honor, those decisions do at times use the language business of baseball. But earlier in those opinions, they tie the business of baseball to something more specific. For instance, in the federal baseball case, when describing the business of baseball, they say exhibitions of baseball games. So the players clearly are related to the business of putting on baseball game exhibitions, right? Yes, Your Honor. So is the manager, even though he sits in the dugout? Yes, Your Honor. So is the general manager who makes decisions about what players are going to be hired by the team? Yes, Your Honor. So I think what you're getting at is where you— Yes, Your Honor. And what about then the people who advise the general manager as to what players should be put on the field to participate in this exhibition? They're different? Your Honor, yes. I would submit that at a certain point, you do get to a different level. And the reason is this. Even defendants' own rule makes that distinction. So Major League Rule 3K, which is what they describe as their anti-tampering rule, it lists managers in it, it lists players in it, and it lists umpires in it. But it does not list scouts. I thought you were the ones who said they have an agreement that relates to scouts. Yes, Your Honor. Yes, you're right. The allegation and the complaint is that they have taken that anti-tampering clause and as part of an anti-poaching agreement, have enacted this anti-poaching agreement in the market for scouting services. So I'm not following how you can rely on a rule that applies anti-poaching to certain people to say, well, that's definitive as to who's involved in putting on baseball exhibitions, even though the people who wrote that rule actually apply it to your clients as well. I think there's two points there, Your Honor. The first is that when they were actually developing the rule, they saw a need for perhaps for that rule when it came to managers and coaches and players because those are the people that are part of the core business that are staging the professional baseball games that fans are coming to pay to see. But scouts, on the other hand, are more collateral. And as the Ninth Circuit put it, even under a broader view, the exemption should have limits. And as the Eleventh Circuit put it, that position is no doubt correct. And the Ninth Circuit said that when it comes to . . . I understand that the cases that impose those limits have to do with people who are selling peanuts, right, or people who are working the concession stands or the parking lot attendants. Excuse me? Radio broadcasters. Radio broadcasters, yeah, not people who are involved in the creation of the teams that go on the field. Your Honor, so since flood, there have only been a handful of cases, including this one, that have tested the boundaries outside of those core areas of league structure. It's a well-settled rule, doesn't it? I'm sorry, Your Honor. It's indicative that there's a well-settled rule in this area, the fact that there's only been a handful of cases pushing the boundaries. Your Honor, I don't think that that speaks to a well-settled rule. Perhaps Major League Baseball just simply has not been committing antitrust violations in other areas. We can't assume that there's a well-settled rule simply because there aren't a plethora of cases. Counsel, do you concede that we're dealing with a well-settled rule? Your Honor, when it comes to league structure, when it comes to player contracts, yes, I believe that it is well-settled that those . . . Your Honor, I don't think that's well-settled in the post-flood era. The Postema case in the Southern District of New York actually examined a restraint involving umpires. Wait a minute. This court said it applies to umpires. Yes. Are you saying we need to overrule that decision for your case to prevail or that case is wrong and we should not apply it or something? Your Honor, what I'm saying regarding that case is it was a pre-flood case and that in the post-flood era, perhaps that case . . . What in flood? By post-flood, you don't mean post-Mr. Flood. You mean post-flood against Kuhn. Correct, Your Honor. What is there in flood against Kuhn that undermines Salerno or is any help to you at all in this matter? So, a couple of things. So, first, flood repeatedly referred to the reserve clause. Because that's what was at issue in the case. Of course, they referred to that a lot because that's what Mr. Flood was challenging. And, Your Honor, yes, you're right that that is what Mr. Flood was challenging. And he's also what . . . And Congress rode to his rescue, I think after he was dead, but many years after that event and exempted from the baseball exemption the millionaire players who already had one exemption as a practical matter as a result of an arbitrator's decision. And Congress conspicuously did not touch any other aspect of the business of baseball. Yes, Your Honor. But that Curt Flood Act, which was in 1998, should not be read as doing anything but remaining neutral. So, the Postema case that we alluded to in the Southern District of New York in 1994 had just held directly before Congress created the Curt Flood Act that restraints with umpires were outside the scope of the exemption. And another case, the Henderson case, had held that broadcasting was outside the scope of the exemption. So, we should follow what the Southern District said, not what we said about umpires? Your Honor, going back, just to finish off on the Curt Flood Act, and then I'll come back to whether Salerno should be followed or whether Postema should be followed. So, to conclude on the Curt Flood Act, it should not be read to do anything but remaining neutral. That's the correct reading of that act. But regarding Salerno versus Postema, there are two points regarding Salerno. Even if this Court believes that that is a holding that is still the correct rule to be followed, this case can still be distinguished and can still be held to be outside of the exemption. And the reason why is that the job of scouts in this restraint is far more collateral than the job of umpires. I like how you say that. On an operational level, the scouts are essentially the line human resources officers for the team, right? They go out there and do the equivalent of an interview by inspecting the person and seeing how they do. And then they report to the general manager and decisions are made. That's what any human resources department has people doing. Your Honor, in a way, they are information gatherers. That's what we allege in the complaint. But that's far different than the umpires. What this is really about is what fans are coming to pay to see. They're coming to see baseball games at the field of play. As we allege in our complaint, this is an alit. There wouldn't be baseball games on the field of play if somebody didn't hire the players to play, right? Your Honor, that's correct. But the important point is that the scouts are not the ones that are doing the hiring. The scouts are removed from that process. But they're integral to that process. They are passing reports on to the people that actually do the hiring. So unlike managers and unlike umpires and unlike players, you can have games without scouts. If there were no scouts tomorrow, you could still have professional baseball games for profit. For selecting players. But under the current system that's there, the scouts are essential to the method for using to select players. But as we alleged in the complaint, and this is in paragraphs 95 and 96. You can also find it in paragraph 123 of our complaint. That is collateral to the actual staging of professional baseball games for profit. Outside exhibition. If you determine the business of baseball is solely exhibition, I see your point. But it has not been so limited. These are not peanut sellers or radio broadcasters. These are the people who put the people on the field. At the beginning. At the beginning of the chain. Your Honor, the important point is that it's at the beginning of the chain. And there are several links in that chain. Until you get to the point that you're actually seeing the professional baseball players on the field. And so for these reasons, we ask this court not to extend the exemption into a new area. But to instead narrowly construe the exemption. Which complies with the Supreme Court's directive to narrowly construe exemptions. Especially since we're dealing with a judicially created exemption. That has been often criticized. We're dealing with an area that the exemption has never been extended into before. And so for these reasons . . . That's literally the argument that was made to this court in Salerno and rejected. The argument was made, this is a terrible rule. The underlying rule is terrible. It has no logic to it at all. So it's a little hard to make an argument based on what the logic of the exemption is. Since the actual answer is, there isn't any. And the Supreme Court has recognized . . . At least under the modern interpretation of the Commerce Clause, there isn't any. The Supreme Court itself recognized that when it didn't extend this exemption to other sports. It's a total anomaly. And the argument was made in Salerno, it's a total anomaly. And this court said in response to that, yeah, it's terrible. It's probably going to be overruled by the Supreme Court. But we can't overrule it. We've got to apply it in good faith the way it is. And indeed, it turned out that their prediction was wrong. And the Supreme Court continued, unfortunately, to adhere to this terrible rule. So, you know, you're making exactly the argument that was rejected in Salerno, it seems to me. Your Honor, what I would leave you with is . . . You know, whenever Flood termed the exemption an aberration, it said in the very next sentence, in the very next paragraph, on page 272 of the opinion, that the exemption rests on baseball's unique characteristics and needs. And then went on to use a narrow application of stare decisis and reliance considerations. The reliance considerations were that this industry of the farm system had come to rely on the Reserve Clause. And that this issue of league structure had come to rely . . . had grown in reliance on having an exemption. Those were the two core areas that the Supreme Court was concerned about. And in conclusion, I would submit to you that the line should be drawn in this case. And that the exemption should be narrowly construed. And that this matter should be held outside of it. And I'd like to reserve a minute for rebuttal. Thank you. You have reserved one minute for rebuttal. Thank you, Your Honors. Now we'll hear from baseball. Good morning. May it please the Court, my name is Elliot Peters. I represent the appellees in this Court, as I did in the Court below. Judge Gardefee correctly applied binding precedent from this Court . . . and the United States Supreme Court, in granting the motion to dismiss. And for that reason, the judgment should be affirmed. Based on cases from the U.S. Supreme Court . . . from this Court . . . recent cases from the Ninth Circuit . . . the Eleventh Circuit . . . the Seventh Circuit . . . the business of baseball is exempt from enforcement of the antitrust law. You would acknowledge, would you not, that that exemption is anomalous, to say the least? The courts have said so, in affirming the exemption. They've said it repeatedly. I understand. And, you would acknowledge that it is at least ironic . . . that the one thing that in Flood against Kuhn, the Supreme Court really emphasized was . . . this reserve clause is critical. The whole business of baseball has grown up around this. That's why we've got to leave this. And it turned out, baseball got along pretty well without the reserve clause . . . after it was struck down by the arbitrator. And then, that one critical big thing got kind of a kick in the butt from Congress in the Curt Flood Act. So, I mean it's a little . . . it's actually a little odd that this anomaly is going to persist at a very broad level . . . when really the things that the Supreme Court was relying on as so critical to baseball . . . are matters of history now. Ironic, or perhaps the result of deference by Congress to the collective bargaining process . . . which is taking place in baseball. But, nonetheless, in the Flood case . . . and I beg to differ with my colleague about the interpretation of that case . . . because the last three paragraphs of that case could not be clearer. That it's anomalous, but without re-examination of the underlying issues . . . They're quoting Toulson in Flood. And then, the court says, quoting again Federal Baseball . . . The remedy, if any, is indicated, is for congressional and not judicial action. The bottom line is, the Supreme Court said, the business of baseball is exempt. That's the bottom line, Your Honor. And your argument is, essentially, as we've been discussing . . . that scouts are a critical part of the business of baseball. Exactly. I mean, as we wrote in our brief . . . If they're not in the business of baseball . . . If baseball scouts are not in the business of baseball . . . then, appellants should tell this court what business they are, in fact, in. Because, it is their work . . . looking at scouting players that allows teams to make decisions about the draft . . . that causes teams to be fielded . . . that results in trades being made. Their work leads to what players play the game on the field. They are, in fact, integral. Scouts perform another function. They go out and scout opposing teams . . . to see who shifts, or who bunts, or who does what. They are involved, integrally, in the business of baseball. And, there's . . . it's not even possible to conceive of what other business . . . they would be involved in, if it's not baseball. And, since they are involved in the business of baseball . . . the district court was correct in applying the antitrust exemption. That raises another . . . just a side light . . . that I probably should ask your adversary about, rather than you. But, the briefing, especially on their side, talks about talent scouts. And, I was wondering whether there is any distinction that's intended or drawn . . . between people who go out and look for talented baseball players, not yet professional . . . and people who scout opposing teams. Because, I wasn't clear on whether they were actually representing people in that other category . . . whether that is another category, or whether everybody is just a scout . . . as far as you're concerned. As I understand, the putative class that they were hoping to represent, as the case moved forward . . . involved all scouts. But, I don't think that makes any difference in the outcome of the case . . . because, they're all involved in the business of baseball. Umpires in Salerno. They talk about Postima. I don't think Postima can be viewed as being correctly decided. It was reversed, on other grounds. But, the decision didn't survive and was never reviewed by the school. But, there was a fundamental problem in Postima . . . which is that this court had previously said through Judge Friendly . . . that the umpires were part of the business of baseball and was . . . and therefore the exemption applied. The Ninth Circuit recently applied it to location of franchises. Yes, you invoked one of the household gods over here, Judge Friendly. I didn't want to say anything which would offend Judge Friendly. But, the Ninth Circuit even more recently, through Chief Judge Thomas in the Ninth Circuit . . . applied the exemption to minor league players. So, the idea that this involves some extension of the doctrine isn't well founded. And, the last point I think that really is worth making is that they . . . Appellants talk about an intermediate position. And, they like to refer to this language about the baseball's unique characteristics and needs. But, a fair reading of Flood shows that that's a historical explanation . . . and justification for the existence of the antitrust exemption. It's not a narrowing of the exemption in Flood . . . because the Supreme Court comes right back at the end of Flood . . . and says, we're sticking with federal baseball in Toulson. They may be anomalous, as Judge Lynch says. But, that's the law and if somebody's going to change it, it's got to be Congress. And, as Judge Friendly said, if somebody's going to reverse the Supreme Court . . . it's got to be the Supreme Court. So, unless there are further questions for all of those reasons . . . I respectfully suggest that the judgment of the district court should be affirmed. Thank you. Let's reserve one minute for rebuttal. Mr. Honors, I would just like to make two quick points. Aren't you in the business of baseball? Excuse me, Your Honor. Aren't you in the business of baseball? Am I in the business of baseball? No, your clients. Are my clients in the business of baseball? So, one . . . Maybe you two, but certainly aren't your clients. Formally, but no longer. So, one point that I would like to make that relates to that is . . . the job of what scouts do, we alleged in the complaint . . . that what they do is not essential to the business of baseball. That should be accepted as true. Is the test essential or is the test in the business? Your Honor, what we submit should be the proper test . . . as it should be tied to the language of flood of the unique characteristics and needs . . . because that provided the new basis and the new rationale for the exemption. And, in particular, the unique characteristics and needs were the league structure and the player contracts . . . what they had grown in reliance on. And, really when you look at this, the business of baseball overall . . . has grown exponentially since 1921 . . . and has changed dramatically, even from the current flood case in 1972. And so, it can't be that the business of baseball, for purposes of this exemption . . . reaches every tentacle of business that baseball has. Instead, it should be tailored to those exhibitions of professional baseball games for profit . . . which was the language that Toulson used, the language that Federal Baseball used . . . and the language that flood eventually . . . What's covered by that? Pretty much only the players, it sounds like, right? On your interpretation. Players, league structure. Those are the two core areas where the . . . Because the players are no longer, no longer need the . . . That's all gone. Major league players, it's gone. Major league players, yeah. As the Miranda case found, the minor league players. And so, that involves the minor league system that has come to develop . . . in reliance on this antitrust exemption. That would still be exempt as well. Those are two core areas, two important areas for the industry. And so, there wouldn't be a flood of cases coming into courts . . . if the narrow approach, if the more intermediate approach was adopted. Pun intended, correct? Yes, Your Honor. So, again, I would like to lastly reiterate, finally reiterate that . . . we submit that the best interpretation is to take that intermediate construction . . . has been used, not just by one court, not just by the Postima Court . . . but also by the Henderson Court, also by the Laumann Court . . . and find that this is, and narrowly construe this exemption . . . instead of broadly construing it and extending it into a new area . . . to allow the case to move forward, to allow more factual development . . . to indeed find out whether the scouts are performing a job . . . that's collateral to the actual business of baseball. Thank you, Your Honors. Thank you both. We'll reserve decision.